IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

ANDREW DAVIS,                          )
                                       )
        v.                             )        NO.  3:11-0343
                                       )
ROLAND COLSON[1]                       )


TO: Honorable Kevin H. Sharp, District Judge


# R E P O R T   A N D   R E C O M M E N D A T I O N

By Order entered December 10, 2013 (Docket Entry No. 50), the above captioned Petition

for a writ of habeas corpus filed under 28 U.S.C. § 2254 was referred to the Magistrate Judge for

further proceedings under Rule 8(b) of the Habeas Corpus Rules, 28 U.S.C. § 636(b)(1)(B), and

Rule 72.03 of the Local Rules of Court.

Presently pending before the Court are the Respondent's motion for summary judgment

(Docket Entry No. 34) and the Petitioner's motion for summary judgment (Docket Entry No. 42).

Set out below are the Court's recommendations for disposition of the motions.


## I.  PROCEDURAL BACKGROUND

The Petitioner is an inmate of the Tennessee Department of Correction confined at the

Riverbend Maximum Security Institution ("RMSI").  In July of 2001, he was tried before a jury in

---

[1] By Order entered May 15, 2012 (Docket Entry No. 31), Roland Colson, the Warden of the
Riverbend Maximum Security Institution, was substituted for the State of Tennessee as the
Respondent.

Davidson County, Tennessee, on charges of first degree murder, felony murder, and aggravated child abuse for his role in the death of an eight month old boy who suffered massive head injuries while in the care of the Petitioner on January 28, 2000, and who died as a result of these injuries. The trial resulted in a mistrial after the jury was unable to reach a verdict. See Trial Transcript (Docket Entry No. 38-6), at 71. After a second trial, the Petitioner was convicted on March 2, 2002, of first-degree felony murder and aggravated child abuse. He received a sentence of life imprisonment with the possibility of parole for the felony murder conviction and a concurrent sentence of 22 years imprisonment for the aggravated child abuse conviction.

The Petitioner filed a direct appeal raising claims of insufficiency of the evidence, trial court error, and denial of due process. The Tennessee Court of Criminal Appeals affirmed his convictions on July 9, 2004. See State. v. Davis, 2004 WL 1562544 (Tenn.Crim.App. July 9, 2004); Docket Entry No. 29-1, at 142-163. The Tennessee Supreme Court subsequently denied the Petitioner's application for permission to appeal. See Docket Entry No. 29-1, at 270. The Petitioner thereafter filed a petition for post-conviction relief in the state court raising 20 specific claims of ineffective assistance of trial counsel and two claims of trial court error. After holding a hearing, the state court denied the petition on January 5, 2009. See Docket Entry No. 29-3, at 95-135. On July 14, 2010, the Tennessee Court of Criminal Appeals affirmed the denial of post-conviction relief. See Davis v. State, 2010 WL 2787700 (Tenn.Crim.App. July 14, 2010); Docket Entry No. 29-10, at 139-154. The Tennessee Supreme Court subsequently denied his application for permission to appeal. Id. at 235.

Failing to obtain relief in the state courts, the Petitioner filed a pro se petition in this court seeking habeas corpus relief under 28 U.S.C. § 2254 to set aside his convictions. See Petition

(Docket Entry No. 1). The Federal Public Defender was subsequently appointed to represent the Petitioner. See Docket Entry No. 8. In his Petition, the Petitioner asserts nine claims of ineffective assistance of trial counsel, a claim that the cumulative effect of the alleged ineffective assistance of counsel prevented him from having a fair trial, and two claims of trial court error. The claims raised by the Petitioner essentially mirror the claims that he raised in his state post-conviction proceeding.

The Respondent filed an answer on May 23, 2012, see Docket Entry No. 32, and thereafter moved for summary judgment. In the motion, the Respondent argues that the Petitioner has not fully exhausted Claims 1D, 1G-F (various theories of ineffective assistance) and Claim 2 (trial court evidentiary error) because they were not fully and fairly presented to the state court and, thus, these claims should be denied as procedurally defaulted. With respect to the remaining claims, the Respondent contends that these claims should be dismissed because the determination of these claims by the Tennessee Court of Criminal Appeals was not contrary to, or an unreasonable application of, clearly established federal law as established by the Supreme Court and, thus, the Petitioner has not established a meritorious claim for relief under 28 U.S.C. § 2254.

In lieu of filing a response in opposition to the Respondent's motion of summary judgment, the Petitioner was permitted to file his own motion for summary judgment. See Orders entered May 8, 2013 (Docket Entry No. 37), and July 26, 2013 (Docket Entry No. 40). In his motion for summary judgment, the Petitioner expressly narrows his petition to a single claim of ineffective assistance of counsel based on trial counsel's failure to procure and present a medical expert in the Petitioner's defense at the Petitioner's second trial. See Docket Entry No. 42, at 1. Accordingly, all other claims raised in the Petition are deemed abandoned.

## II. FACTUAL BACKGROUND

The underlying facts of the crimes at issue are set out at length in the opinions of the state appellate courts.  See State. v. Davis, 2004 WL 1562544 (Tenn.Crim.App. July 9, 2004); Docket Entry No. 29-1; Davis v. State, 2010 WL 2787700 (Tenn.Crim.App. July 14, 2010); Docket Entry No. 29-10.  Although a full recitation of these facts need not be recounted herein, a summary of the crucial facts is as follows.

The victim was the eight month old son of Jessica Blankenship,[2] a woman with whom the Petitioner was engaged to be married.  The Petitioner was not the baby's biological father.  On January 28, 2000, the baby was left in the care of the Petitioner at Mrs. Blankenship's apartment while she left to attend to other matters that afternoon.  The baby was fussy and crying at the time but was in no other distress and Mrs. Blankenship left the victim in his crib.  At some point during the next hour, the Petitioner and Mrs. Blankenship had a telephone conversation during which the Petitioner stated that the baby was having trouble breathing, and Mrs. Blankenship then contacted a friend and co-worker, Sharron Monticello, to go check on the victim.  Ms. Monticello found the baby on his back in the crib gasping for air.  An emergency call to 911 was placed at 3:31 p.m., emergency responders and Mrs. Blankenship quickly arrived, and the baby was transported to Summit Medical Hospital.

Dr. Bryan Shape was the treating emergency room physician at Summit.  He found that the baby was in full respiratory distress and had a fractured skull.  Because Summit was unable to provide the necessary treatment, the baby was flown by helicopter to the Vanderbilt pediatric intensive care unit where he was treated by Dr. Ellen Clayton, a pediatric physician at Vanderbilt

---

[2]Ms. Blankenship's last name at the time of the events in question was Chilton.

Hospital who also serves on a specialized team that examines children admitted with injuries suspected to have been caused by abuse or neglect. Dr. Clayton determined that the baby had suffered multiple skull fractures, cranial hemorrhaging, massive retinal hemorrhaging, and a torn frenulum.[3] The baby eventually died at the hospital that evening.

An autopsy on the baby was conducted by Dr. John Gerber the next day. In his report, dated February 11, 2000, Dr. Gerber concluded that the cause of death was blunt force injury to the head. His external examination revealed that the baby had an abrasion on the right side of his head, two contusions on his forehead, and a laceration of the frenulum in his mouth. The internal examination revealed two occipital skull fractures and one parietal skull fracture, none of which were interconnected or interrelated. The examination also revealed cerebral edema, a subgaleal hemorrhage, a subdural hemorrhage, a subarachnoid hemorrhage, and retinal hemorrhaging in both eyes. The frenulum tear was determined to have occurred a few hours before the baby's death and would have bled significantly.

During the time that the baby was being treated, the Petitioner offered no explanation to Mrs. Blankenship, to the medical care providers, or to anyone else of how the baby was injured, saying only that he found the baby in his crib unresponsive. On the evening of the incident, the Petitioner accompanied Detective Jeff Goodwin back to the apartment after Goodwin obtained consent to walk through the apartment. During conversations with Goodwin at the apartment, the Petitioner continued to deny knowledge of how the baby was injured. The Petitioner was later interviewed by Goodwin and two other detectives at the Vanderbilt Hospital that night. He again

---

[3] In layman's terms, Dr. Clayton explained that the frenulum is "a little membrane that connects your gum to your upper lip." See Trial Transcript (Docket Entry No. 28-4), at 79.

denied knowledge of how the baby was injured and denied dropping the baby, but he admitted that he had noticed blood in the baby's mouth after his telephone conversation with Mrs. Blankenship and that he had cleaned the baby's mouth with a washcloth and changed the baby's clothes. In telephone conversations the Petitioner had with Mrs. Blankenship shortly after the baby's death, which she recorded, he continued to deny any knowledge of how the baby was injured but stated that he was looking into information about skull fractures and blood clots that might explain the baby's head injuries.

The Petitioner was initially indicted by the Grand Jury of Davidson County, Tennessee, on charges of first degree murder and aggravated child abuse and was arrested on February 5, 2000. On March 2, 2001, a superseding indictment was returned adding the charge of aggravated felony murder.

The State's proof at the first trial consisted of eleven witnesses, including the baby's regular pediatrician, the two treating hospital physicians, and the forensic pathologist who conducted the autopsy. Relying on the medical evidence of the baby's injuries and the testimonial evidence about the Petitioner's actions in the aftermath of the incident, including his repeated denials of any knowledge of how the injuries occurred, the State set forth a case that the baby's injuries were caused by an intentional act of abuse by the Petitioner and not by an accident. The Petitioner, who had retained attorney Edward Yarbrough to represent him, testified in his own defense contending that the baby had suffered the head injuries as the result of being accidently dropped by the Petitioner. The Petitioner also presented Dr. Charles Harlan as a medical expert who offered the opinion that the medical evidence did not conclusively support the State's theory and that the baby's injuries could have been caused by the type of fall to which the Petitioner testified. After

deliberating for approximately ten hours, the jury indicated to the trial court that they could not reach a unanimous decision and, after questioning the jury, the trial court declared a mistrial.

At the Petitioner's second trial, the State presented essentially the same witnesses and the same theory as was presented at the first trial and also presented Dr. Bruce Levy, the Chief Medical Examiner for Davidson County, as a rebuttal witness. The Petitioner, who continued to be represented by Mr. Yarbrough, again testified in his own defense and also called three additional witnesses, his parents and former employer. Dr. Harlan was unwilling to testify at the second trial and no medical expert was presented by the defense. After deliberating for approximately fifteen hours, the jury returned a verdict of guilty on the charges for which the Petitioner is currently imprisoned.

At the second trial, Dr. Clayton testified that the nature of the baby's skull fractures and cerebral hemorrhages were not consistent with a fall on a carpeted surface and that the bilateral retinal bleeding that was also present is almost never present in any cases other than child abuse cases. Dr. Gerber testified that his autopsy revealed that the three skull fractures suffered by the baby were complex fractures rather than linear type fractures that occur most frequently in accidental falls. Dr. Gerber testified that it would take more force to produce a complex fracture than a linear fracture, that the lack of interrelation between the three fractures suggested at least two, and maybe three, separate blows, and that the position of the three fractures indicated that the baby received a direct blow to the side of the head and also struck the back of his head on a hard surface. Dr. Gerber testified that he would not expect to see the types of injuries suffered by the baby on a child who was dropped from a height of six feet to a carpeted surface and that if the baby had been dropped and struck his head on a hard object before hitting the floor, the baby would have incurred one linear

fracture. Furthermore, Dr. Gerber testified that, because a baby's head is the heaviest part of the body, if the baby fell over Petitioner's shoulder, the first point of impact would be on the top of the baby's head, not the back of his head. In Dr. Gerber's opinion, the baby's injuries were inconsistent with the Petitioner's explanation that he accidently dropped the baby on the carpet.

The Petitioner testified that he dropped the baby on the day that the baby died, contending that it was an accident. He testified that he had picked the baby up out of his crib shortly after Mrs. Blankenship left and rested him over his shoulder in order to carry him into another room. The Petitioner, who had a pre-existing back injury, testified that he felt a sharp pain in his back that caused him to let go of the baby and the baby slipped over his shoulder and fell to the floor behind the Petitioner. The Petitioner testified that he did not see or hear the baby strike anything and did not notice any marks or blood on the baby when he picked him up off the floor but that the baby was unresponsive and that was when he called Mrs. Blankenship. The Plaintiff testified that he was scared and embarrassed to tell anyone that he had dropped the baby and that it became harder to admit that he had dropped the baby as more time passed. However, the Petitioner's father testified at trial that the Petitioner told him a month to six weeks after the incident that he had dropped the baby.

As a rebuttal witness, Dr. Levy testified that he reviewed Dr. Gerber's autopsy report and agreed with his conclusion that the baby suffered from three separate complex skull fractures. Dr. Levy testified that the baby's injuries, other than the abrasion above his eye, were not consistent with Defendant's testimony that he dropped the baby. Dr. Levy testified that the baby would not have incurred complex fractures from a fall onto a carpeted surface, and in Dr. Levy's opinion, the injuries were intentionally inflicted upon the baby.

## III. POST-CONVICTION PROCEEDINGS[4]

At the Petitioner's post-conviction relief hearing, the state court heard testimony from Mr. Yarbrough, the Petitioner, the Petitioner's mother, and Dr. Janice Ophoven, a medical expert in pediatric forensic pathology from Minnesota.

At the time of the post conviction hearing, Mr. Yarbrough had been practicing law for approximately 28 years and had an extensive background in criminal trials, including experience as both a prosecuting attorney and a defense attorney. He testified that, prior to the second trial, he filed a successful motion for a continuance based on his need to secure a medical expert because Dr. Harlan was unwilling to testify again due to a multitude of reasons, including ongoing litigation over Dr. Harlan's medical license. In his affidavit supporting that motion, Mr. Yarbrough stated:

> [t]he defense believes that there is a significant question in this case regarding the findings of forensic pathologists and that to go to trial without a qualified expert would deny the Defendant his right to a fair trial, and deny him the effective assistance of counsel.

See Docket Entry No. 28-1, at 49-50. Mr. Yarbrough also attested:

> [i]n addition, counsel for the Defendant has been heavily engaged in other criminal and civil litigation and has, therefore, been unable to locate an alternative expert, although several names have been identified and it is anticipated that an expert will be located within the next 30 to 60 days.

Id. Mr. Yarbrough testified that, although he would have liked to have used Dr. Harlan as an expert again given that he obtained a mistrial in the first trial, any attempt to subpoena Dr. Harlan would not have been a viable option given Dr. Harlan's explicit refusal to testify and the possibility that

---

[4] Because the Petitioner has narrowed his federal habeas corpus claim to a single claim of ineffective assistance of counsel based upon trial counsel's failure to present an expert medical witness at the Petitioner's second trial, the Court summary of the post-conviction proceedings in the state court is limited to the scope of that claim.

Dr. Harlan would raise a Fifth Amendment or other testimonial privilege, as he had done to some extent in the first trial, thus creating an unfavorable scenario for the Petitioner.

Mr. Yarbrough testified that he engaged Dan Warlick, Dr. Harlan's attorney, to assist him in attempting to find another medical expert because Mr. Warlick had medical training, had participated in many trials involving medical issues, was familiar with the facts of the Petitioner's case, and had contacts with physicians throughout the Southeast. Mr. Yarbrough testified that he met with Mr. Warlick to discuss possible experts and that Mr. Warlick made follow-up contacts in an effort to find an expert who was willing to testify on behalf of the Petitioner. Mr. Yarbrough testified that he believed that Mr. Warlick had copies of the baby's CT scans to use in his discussion with potential expert witnesses but did not know if medical records of any type were actually sent to the doctors whom Mr. Warlick contacted.

Although Mr. Yarbrough admitted to a professional practice of not keeping written notes and to not keeping time records in the Petitioner's case because he was retained on a flat fee and not on an hourly basis, he testified that, in addition to relying on the assistance of Mr. Warlick, he also personally spoke to one or two doctors from out of state in an effort to convince them to testify but that they were not willing to testify under oath that the baby's injuries could have resulted from the type of fall the Petitioner was asserting happened. Mr. Yarbrough could not recall the names of the physicians but believed that they were from Mississippi and Illinois. He also testified that he spoke by telephone to a lawyer in Mississippi who had tried a similar case to see if the lawyer knew of a medical expert whom Mr. Yarbrough might be able to use. Mr. Yarbrough testified that it was necessary to contact out of state experts because he could not find a doctor in Tennessee who would testify on behalf of the Petitioner.

Mr. Yarbrough testified that he was unable to secure a medical expert who was willing to testify on behalf of the Petitioner and that he was forced to proceed to trial using only cross-examination in an effort to raise doubts about the State's medical testimony. Mr. Yarbrough testified that, having already tried the case once, he was very well prepared for the second trial and denied making any statements to the Petitioner's family that he was not as prepared as he would want to be because of his involvement in another high profile criminal case.

The Petitioner's mother, Renell Davis, testified that Mr. Yarbrough had not had a lot of communication with the Petitioner's family between the first and second trial but that she gave him the names of two doctors who might be experts: Dr. Uzinski, whose name she learned from a television show in September 2001, and Dr. Plunkett, who was a doctor in Georgia whose name a family member provided to her. Mrs. Davis testified that Mr. Yarbrough commented to her that he did not try to contact them because he did not think the Petitioner's family could afford them. Mrs. Davis admitted that she was aware that Dr. Plunkett had been tried for embellishing his medical credentials but believed that the trial occurred two or three months after the Petitioner's second trial. There was no evidence that either Dr. Plunkett or Dr. Uzinski would have agreed to testify on behalf of the Petitioner had they been contacted by Mr. Yarbrough prior to the Petitioner's second trial.

The Petitioner testified that he had no conversations with Mr. Yarbrough regarding a medical expert and left that issue to his family. The Petitioner testified that he believed that it was ineffective of Mr. Yarbrough to not have a medical expert in light of the medical testimony that he knew would be presented by the State at the second trial.

Dr. Ophoven presented extensive testimony at the post-conviction relief hearing and testified that she believed that she had been provided with sufficient materials to render an opinion.

Dr. Ophoven disagreed with Dr. Gerber's conclusion that the baby's injuries resulted from three blows to the head and testified that how the injury took place could not be determined from a review of the medical records. Dr. Ophoven testified that the fatal injury could have been caused by a fall and a single impact from a distance of approximately three feet and that she could have testified to this information in front of a jury but would not have been able to present the jury with a theory of how the accident took place. Dr. Ophoven testified that there was no evidence to indicate that the tear to the baby's frenulum was a recent injury but that the only plausible explanation for the bleeding from the baby's mouth was the tear observed during the autopsy, but that the cause of the tear could not be conclusively determined.

In reviewing the Petitioner's appeal from the denial of post-conviction relief, the Tennessee Court of Criminal Appeals summarized the relevant testimony presented to the lower court as follows:

> The post-conviction court held a hearing on the petition for relief. At the post-conviction hearing, trial counsel testified that he represented Petitioner at both of his trials. Trial counsel was an experienced trial attorney and felt prepared for both trials. In fact, trial counsel spoke with several jurors after the first trial in order to ascertain the most effective portions of the trial.
>
> Trial counsel testified that he met with Petitioner quite a few times about the case. When they first met, Petitioner tried to persuade him that the victim fell off of a piece of furniture. Petitioner later claimed that the injuries were the result of an accident involving a crib. Trial counsel felt as if he was presented with an ethical dilemma about the conflicting stories presented by Petitioner.
>
> Trial counsel stated that he was prepared for Petitioner's first and second trials. During the first trial, he presented the expert testimony of Dr. Charles Harlan in an effort to contradict the State's theory that the victim's injuries were inflicted by Petitioner. Trial counsel contacted Dr. Harlan about testifying during the second trial. Trial counsel was informed that Dr. Harlan was not interested in testifying due to an ongoing investigation into his medical license. Trial counsel tried unsuccessfully to locate another expert that would provide testimony akin to

Dr. Harlan's testimony at the first trial. Trial counsel also explained that he was unable to locate an expert that would examine the x-rays or CAT scans and provide testimony about them at trial.

. . .

Petitioner presented his own expert at the post-conviction hearing. Dr. Janice Ophoven testified at the post-conviction hearing. Dr. Ophoven, a pediatric forensic pathologist, reviewed the medical records that she was provided. She noted that she had not received all of the requested records from the hospital but felt that she had sufficient materials to render an opinion on the case. Dr. Ophoven disagreed with Dr. Gerber's conclusion that the victim's injuries resulted from three blows to the head. Instead, Dr. Ophoven opined that an expert would not be able to determine how the injury took place from a review of the medical records. Dr. Ophoven stated that the fatal injury could have been caused by a fall and a single impact from a distance of approximately three feet. Dr. Ophoven claimed that she could have testified to this information in front of a jury but would not have been able to present the jury with a theory of how the accident took place.

On cross-examination, Dr. Ophoven admitted that she had previously concluded that there was no evidence to indicate that the tear to the victim's frenulum was a recent injury but that the only plausible explanation for the bleeding from the victim's mouth was the tear observed during the autopsy. Dr. Ophoven admitted that the tear could have resulted from abuse or CPR but stated that she could not conclusively say when the injury took place. Finally, Dr. Ophoven stated that she could not conclusively state the cause of the victim's injuries.

Petitioner's mother, Renell Davis, testified that she hired trial counsel to represent Petitioner and had provided him with the name of several potential expert witnesses. Ms. Davis claimed that trial counsel told her that he was not as prepared as he would like to have been for trial due to a high publicity case that trial counsel was working on just prior to Petitioner's second trial.

. . .

At the conclusion of the post-conviction hearing, the court took the matter under advisement. In a separately issued order, the post-conviction court dismissed the petition for post-conviction relief. Specifically, the post-conviction court determined that the testimony of trial counsel was credible. The post-conviction court determined that trial counsel "attempted to secure an expert witness, but that he was not deficient because expert witnesses refused to participate in the case." Further, the assertion by Petitioner that the testimony of Dr. Ophoven would have been beneficial at trial was discounted by the post-conviction court due to Dr. Ophoven's inability to pinpoint whether the cause of death was accidental or intentional. . . .

... In conclusion, the post-conviction court noted that Petitioner "alleged multiple issues related to ... alleged ineffectiveness [of trial counsel]; however, he has failed to do so sufficiently to meet the clear and convincing evidentiary test. Further, the Petitioner has not demonstrated that he suffered any prejudice as a result of the alleged ineffective assistance." As a result, the post-conviction court dismissed the petition for relief.

See Davis, 2010 WL 2787700, at *5-7; Docket Entry No. 29-10, at 146-48.

The Tennessee Court of Criminal Appeals concluded that Petitioner did not show that his

trial counsel was deficient for failing to obtain an expert medical witness to testify at the second trial.

The state court held as follows:

> The testimony at the post-conviction hearing revealed that Dr. Harlan, the Petitioner's expert at the first trial, was unwilling to testify at the second trial. Trial counsel testified that he tried unsuccessfully to find another expert. The post-conviction court accredited the testimony of trial counsel, finding that he attempted to find an expert and was not deficient because all the experts he contacted refused to participate. The post-conviction court also opined that the proposed testimony of Dr. Ophoven was "speculative," and she was unable to take a definitive position in opposition of the State's expert. Further, there was evidence that at least one of the witnesses suggested by Petitioner's mother was being investigated for perjury. The record supports the post-conviction court's determination. See Hugh Andrew Nicely v. State, No. M2006-01892-CCA-R3-PC, 2008 WL 544600, at *9 (Tenn.Crim.App., at Nashville, Feb. 22, 2008), perm. app. denied, (Tenn. Aug. 25, 2008) (holding that a petitioner did not establish ineffective assistance of counsel where the petitioner was able to provide post-conviction testimony of an expert that disputed the methodology of the State's expert but was unable to provide a conclusion that supported petitioner's version of the events); Michael Anderson Peek v. State, No. E2003-00449-CCA-R3-PC, 2003 WL 22734616, at * 12 (Tenn.Crim.App., at Knoxville, Nov. 20, 2003), perm. app. denied, (Tenn. Apr. 5, 2004) (affirming decision by post-conviction court that trial counsel was not ineffective for failing to secure an expert witness where counsel had consulted with an expert who supported the findings of the State and would not have benefitted the petitioner's case at trial). Petitioner in this case has failed to establish by clear and convincing evidence that he is entitled to post-conviction relief on the basis of ineffective assistance of counsel on this issue.

See Davis, 2010 WL 2787700, at *9; Docket Entry No. 29-10, at 149-50.

# IV. CONCLUSIONS

Upon consideration of the entire record, it appears that an evidentiary hearing is not required in this matter. Therefore, the Court should dispose of the Petition as the law and justice require. <u>See</u> Rule 8, Rules Governing Section 2254 Cases; 28 U.S.C. § 2254(e)(2); <u>Mitchell v. Rees</u>, 114 F.3d 571 (6th Cir. 1997); <u>Loveday v. Davis</u>, 697 F.2d 135, 137-40 (6th Cir. 1983).

<u>A. Applicable Standards for Habeas Corpus Review Under 28 U.S.C. § 2254</u>

28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L. No. 104–132, 110 Stat. 1214 (1996), provides the following with respect to considering a writ of habeas corpus to prisoners who are in custody pursuant to a state court judgment:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

In <u>Bell v. Cone</u>, 535 U.S. 685, 693, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002), the Supreme Court reiterated that the AEDPA modified a federal court's role in reviewing state prisoner applications for relief under Section 2254 "in order to prevent federal habeas 'retrials' and to ensure that state court convictions are given effect to the extent possible under the law." By its terms

Section 2254(d) bars relitigation of any claim "adjudicated on the merits" in state court, subject only to the exceptions in Sections 2254(d)(1) and (d)(2). <u>See</u> <u>Harrington v. Richter</u>, _ U.S._, 131 S. Ct. 770, 784, 178 L. Ed. 2d 624 (2011).

A state court judgment is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." <u>Williams v. Taylor</u>, 529 U.S. 362, 412–13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Under the "unreasonable application" clause, the Supreme Court found that a state court judgment results in an "unreasonable application" of clearly established federal law "if the state court correctly identifies the governing legal principle from [the Supreme Court's] decisions but unreasonably applies [that principle] to the facts of the particular case." <u>Bell</u>, 535 U.S. at 694.

When state courts have made factual determinations regarding issues presented for federal habeas corpus review, such determinations are presumed to be correct, and the petitioner has the burden of rebutting that presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); <u>Mitchell v. Mason</u>, 325 F.3d 732, 737-38 (6th Cir. 2003). This presumption of correctness includes the credibility determinations of the state courts. <u>Skaggs v. Parker</u>, 235 F.3d 261, 266 (6th Cir. 2001).


B. Ineffective Assistance of Counsel

To establish a claim of ineffective assistance of counsel, the Petitioner must show that counsel's performance was in some way objectively deficient to the point that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. <u>Strickland v. Washington</u>, 466

U.S. 668, 687-690, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Further, the Petitioner must show that the deficient performance prejudiced his defense such that the Petitioner was deprived of a fair trial, or, in other words, but for counsel's errors, the result of the proceedings would have been different. Id. at 692-94; Ward v. United States, 995 F.2d 1317, 1321-22 (6th Cir. 1993); Sims v. Livesay, 970 F.2d 1575 (6th Cir. 1992).

Because "counsel is strongly presumed to have rendered adequate assistance" and the acts of counsel are viewed within the context of the circumstances at the time and not with the benefit of hindsight, judicial scrutiny of counsel's performance must be highly deferential. Strickland, 466 U.S. at 689-90; O'Hara v. Wigginton, 24 F.3d 823, 828 (6th Cir. 1994); Sims, 970 F.2d at 1579-80. As to the "performance" inquiry, "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." Strickland, 466 U.S. at 688. To establish prejudice due to his counsel's errors or omissions, Petitioner must establish a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Williams, 529 U.S. at 390–91; Strickland, 466 U.S. at 694.


C. Analysis of the Petitioner's Claim

In the instant case, the Petitioner argues that his trial counsel's failure to obtain an expert medical witness in a complicated murder case involving the death of a child under contested circumstances allowed the testimony of five State medical experts to go unchallenged by any defense

expert.[5]  The Petitioner contends that trial counsel knew contrary medical opinions existed and that refuting the State's medical evidence was crucial to rendering the Petitioner's account of an accident a viable defense, yet trial counsel made almost no effort to search for an expert and proceeded to trial without an expert despite recognizing that it would be devastating to do so.  The Petitioner asserts that trial counsel thus failed to provide the effective assistance of counsel guaranteed by the Sixth Amendment.  <u>See</u> Petitioner's Motion for Summary Judgment (Docket Entry No. 42), at 25.  In setting forth this argument, the Petitioner challenges the state court's decision as an unreasonable application of clearly established federal law, as well as a decision that was based on an unreasonable determination of facts in light of the evidence presented at the state court proceeding.  <u>Id</u>. at 26.

The Court has conducted a full review of the record in this action and finds that the Petitioner's argument for habeas corpus relief lacks merit.  The state court's decision was neither an unreasonable application of clearly established federal law nor based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  Accordingly, federal habeas corpus relief is not warranted and the Petition should be denied.

The Court first addresses the Petitioner's argument that the state court decision was based on an unreasonable determination of the facts in light of the evidence presented in the state post conviction proceeding.  In deciding the Petitioner's ineffective assistance of counsel claim, the Tennessee Court of Criminal Appeals found that the post-conviction court accredited the testimony of trial counsel that he attempted to find an expert but that all the experts he contacted refused to

---

[5] The Court notes that, although five physicians testified at the Petitioner's second trial, only three of these physicians, Drs. Clayton, Gerber, and Levy, were actually presented as expert witnesses.  <u>See</u> Docket Entry No. 28-4, at 56; Docket Entry No. 28-8, at 126; and Docket Entry No. 28-10, at 97.

participate.  See Docket Entry No. 29-10, at 149-50.  The Petitioner portrays the factual record that was before the state court as insufficient to support the state court's decision and asserts that "trial counsel did almost nothing to find an expert," that there was "ample evidence of trial counsel's neglect," and that there was an "utter lack of effort [by Mr. Yarbrough] to find another expert."  See Docket Entry No. 42, at 30 and 39-40.

However, the Court finds that there was evidence presented in the state post-conviction relief proceeding that can reasonably be viewed as supporting the state court's factual findings and its ultimate decision that the Petitioner's trial counsel was not deficient for failing to obtain an expert medical witness to testify at the second trial.  Although the testimony of Mr. Yarbrough was not buttressed by written notes from his case file memorializing his actions and although he was unable to remember specific names of potential experts, he specifically testified that he spoke on the telephone with at least one, and possibly two, potential experts from out of state in an effort to persuade them to testify on the Petitioner's behalf.  See Post-Conviction Relief Transcript (Docket Entry No. 29-4), at 38-40 and 43-46.  He also specifically testified that he spoke with an out of state attorney who had tried a similar case in an effort to find a potential expert via that attorney.  Id. at 46.  Mr. Yarbrough further testified that he engaged Mr. Warlick and Dr. Harlan to assist him in locating an expert but, despite their collective efforts, they could not find an expert who would testify on behalf of the Petitioner.  Id. at 18, 40, and 46.

Counsel for the Petitioner makes much of the fact that Mr. Yarbrough relied on the assistance of Mr. Warlick in his attempt to find an expert witness as support for his contention that Mr. Yarbrough's representation was deficient.  The Court disagrees.  The post conviction record shows that Mr. Warlick was an attorney who had a medical background and experience as a medical

examiner and who also was familiar with the specific facts of the Petitioner's case. The post conviction record further shows that Mr. Yarbrough and Mr. Warlick actively worked together in the quest to find a medical expert. Id. at 18-19, 39-41, and 44-45. The post conviction record does not support the Petitioner's assertion that the efforts taken by Mr. Warlick to obtain an expert witness were themselves inadequate. Id. The Petitioner's contention that each potential medical expert to whom Mr. Yarbrough or Mr. Warlick spoke should have been given the medical file in the Petitioner's case is unpersuasive. While a retained medical expert certainly should have access to the full medical file, it is not unreasonable or deficient for preliminary discussions with a potential expert to occur without the full medical file being forwarded to the potential expert. The Court finds that there is simply nothing in the record supporting a conclusion that Mr. Yarbrough's reliance on the assistance of Mr. Warlick to find a medical expert was a shirking of Mr. Yarbrough's duties. Rather, the record reflects that it was a reasoned and informed decision made in an effort to best find a medical expert in a difficult situation.

Indeed, the difficulty of finding an expert who would testify favorably for the Petitioner is evidenced by the record in the post conviction proceeding. Although the Petitioner located Dr. Ophoven in Minnesota for the post-conviction proceeding, the post-conviction record indicates that there were no local or even regional medical experts whom Mr. Yarbrough could have located. The Petitioner presented no proof at the post conviction hearing that there was a medical expert located anywhere in Tennessee or even within the Southeast at the time of the Petitioner's second trial who would have testified in favor of the Petitioner had the expert been contacted by Mr. Yarbrough. Although the Petitioner's mother testified that she gave Mr. Yarbrough the names of two doctors, there was no proof in the post conviction record that either doctor was actually an

expert, that either doctor would have been able and willing to have testified at the Petitioner's second trial, and that either doctor would have presented testimony that would have corroborated the Petitioner's account of the events that led to the death of the baby. Furthermore, as noted by the Tennessee Court of Criminal Appeals, the proof at the post conviction hearing suggested that one of these doctors was under investigation for perjury. See Docket Entry No. 29-10, at 150.

The state court's determination that Mr. Yarbrough was credible in his testimony, as well as the state court's factual findings, are entitled to a presumption of correctness in this Court. 28 U.S.C. § 2254(e)(1); Sumner v. Mata, 449 U.S. 539, 546-47 101 S.Ct. 784, 66 L.Ed.2d 722 (1981); Skaggs, 235 F.3d at 266. The Petitioner has not presented clear and convincing evidence sufficient to overcome the presumption that these underlying facts are correct. Given that there was evidence in the state post conviction relief proceeding that could reasonably support the factual findings made by the state court, the Petitioner's Section 2254(d)(2) attack on the factual underpinning of the state court's decision lacks merit. See Wood v. Allen, 558 U.S. 290, 301, 130 S.Ct. 841, 175 L.Ed.2d 738 (2010); Rice v. Collins, 546 U.S. 333, 341-42, 126 S. Ct. 969, 976, 163 L. Ed. 2d 824 (2006).

The Court also finds that the Petitioner's argument that the state court's decision was an unreasonable application of clearly established federal law lacks merit. The state court correctly recognized Strickland v. Washington as the applicable standard for the Petitioner's claim and held that, to establish ineffective assistance of counsel, the Petitioner must show that his counsel's performance was objectively deficient and that the deficient performance was prejudicial to the Petitioner. See Docket Entry No. 29-10, at 148-49. The state court, after determining that the evidence in the post conviction proceeding showed that Mr. Yarbrough's efforts to secure an expert witness were not deficient and, further, that the proposed testimony of Dr. Ophoven was speculative,

concluded that the Petitioner failed to show that he suffered ineffective assistance of counsel under this standard.

Within the context of a claim for relief under Section 2254, the question for this Court is not whether this Court would reach the same conclusion as the state court if presented with the question upon a direct review or upon de novo review. Harrington, 131 S.Ct. at 785-86. The question is also not whether the state court's decision can be said to be erroneous. Id.; Cristini v. McKee, 526 F.3d 888, 897 (6th Cir. 2008). The pivotal question is whether the state court's application of the Strickland standard was unreasonable. Harrington, 131 S.Ct. at 785. A state court's determination is reasonable so long as "fairminded jurists could disagree" on the correctness of the state court's decision. Id. at 786; Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004). Put another way, the standard for deeming a state court's application of federal law to be unreasonable demands that the "state court decision [be] so clearly incorrect that it would not be debatable among reasonable jurists." Herbert v. Billy, 160 F.3d 1131, 1125 (6th Cir. 1998). As the United States Supreme Court has explained, a state prisoner seeking federal habeas corpus relief must show that "the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington, 131 S. Ct. at 786-87.

The standard of Strickland is not subject to bright line thresholds and it allows for a strong presumption that counsel's representation was within the "wide range" of reasonable professional assistance. Strickland, 466 U.S. at 688. The issue is not whether the Petitioner received the best representation possible but whether his attorney's representation amounted to incompetence under the prevailing professional norms. Harrington, 131 S.Ct. at 788 (quoting Strickland, 466 U.S. at

690) (internal citations omitted). Further, when reviewing an ineffective assistance of counsel claim in the context of Section 2254, "the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard." <u>Harrington</u>, 131 S. Ct. at 788.

Given these legal principles, the state court's decision was not an unreasonable application of <u>Strickland</u>. The state court found that Mr. Yarbrough made attempts to find an expert witness, that these attempts were not deficient, and that he was unable to locate an expert witness because all of the witnesses he contacted refused to participate. The state court also had before it: (1) evidence of the multitude of other ineffective assistance of counsel claims raised by the Petitioner in the state court, which the state court found to be meritless, indicating that the overall representation provided by Mr. Yarbrough was effective; and (2) evidence that, in the absence of an expert witness at the second trial, Mr. Yarbrough nonetheless attempted to discredit the state's case through vigorous cross-examination. Given this context, the state court could have reasonably concluded that counsel's efforts to find an expert witness, albeit unsuccessful, were within the range of the prevailing professional norms.

The instant case is not one in which the settled facts show that counsel's failure to present an expert witness at trial was due to an uninformed and unreasonable strategic decision to forgo an expert witness, an unreasonable failure to investigate, a lack of trial preparation or lack of consultation with a known expert witness, or a failure to ensure the presence of an expert witness who was available to testify. Thus, the instant case is distinguishable from cases relied on by the

Petitioner in his supporting memorandum as examples of deficient performance of counsel in failing to secure an expert witness. See Docket Entry No. 42, at 28 and 32-33.[6]

This Court does not minimize the potential importance that a medical expert may have had at the Petitioner's second trial or the Petitioner's assertion that his defense would have been bolstered if a medical expert had testified on his behalf. However, the state court heard the Petitioner's claim, weighed the evidence, and determined that the absence of an expert witness at the Petitioner's second trial was not the result of constitutionally deficient performance on the part of Mr. Yarbrough. This Court's review of the record leads to the conclusion that fair minded jurists could disagree on the correctness of the state court's decision. Therefore, this Court cannot find that the state court made an unreasonable application of the Strickland standard. Harrington, 131 S.Ct. at 786.[7]

## RECOMMENDATION

For the reasons set out above, the Court RECOMMENDS that the Respondent's motion for summary judgment (Docket Entry No. 34) be GRANTED, the Petitioner's motion for summary judgment (Docket Entry No. 42) be DENIED. The Petition for a writ of habeas corpus should be DENIED and this action be DISMISSED.

---

[6] See Richey v. Bradshaw, 498 F.3d 344 (6th Cir. 2007); Gersten v. Senkowski, 426 F.2d 588, 607-08 (2nd Cir. 2005); Soffar v. Dretke, 368 F.3d 441, 476-78 (5th Cir. 2004); Holsomback v. White, 133 F.3d 1382, 1387 (11th Cir. 1998); Butler v. Hosking, 1995 WL 73132 (6th Cir. Feb. 22, 1995); Sims v. Livesay, 970 F.2d 1575 (6th Cir. 1992).

[7] Because the Strickland standard requires both a showing of constitutionally deficient performance by counsel and prejudice arising from that performance, this Court's finding that the state court's decision that Mr. Yarbrough did not render deficient performance is sufficient to deny the Petitioner's Section 2254 claim and the Court is not required to address the prejudice prong as determined by the state court.

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of receipt of this notice and must state with particularity the specific portions of this Report and Recommendation to which objection is made.  Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's Order regarding the Report and Recommendation.  See Thomas v. Arn, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); United States v. Walters, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,


JULIET  GRIFFIN
United States Magistrate Judge